

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00223-CV

———————————————

LIBERTY CENTERPOINT, LLC[1] AND SHULAMIT PRAGER, Appellants

V.

PINNACLE BANK, Appellee

---

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-352887-24

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

---

[1]Liberty filed a notice of appeal and three months later filed a notice of withdrawal of its notice of appeal in the trial court. Because Liberty did not file a motion to dismiss its appeal, it remains in the style of the case.

# MEMORANDUM OPINION

## I. Introduction

In a single issue, Appellant Shulamit Prager contends that the trial court erred by granting summary judgment in favor of Appellee Pinnacle Bank on a deficiency claim against Liberty Centerpoint, LLC and Prager. In an underlying transaction, Pinnacle loaned money to Liberty, and Prager guaranteed the loan's repayment.[2] The issue before us is narrow. Guarantor contends that when the Bank foreclosed on the property securing the loan, the amount it bid at the foreclosure sale was far less than the property's fair market value. Guarantor argues that she may rely on the affirmative defense created by Texas Property Code Section 51.003 to assert that the Bank's deficiency claim is too high because its bid did not reflect the fair market value. The Bank responds that the guaranty executed by Guarantor waived that defense. We agree with the Bank and hold that the guaranty clearly and specifically waived Guarantor's ability to invoke the Section 51.003 defense. Thus, the trial court did not err by granting a summary judgment decreeing that Guarantor had waived her ability to rely on Section 51.003 and by awarding the Bank the full deficiency that it claimed.

## II. Factual and Procedural Background

Borrower borrowed $40,000,000 from the Bank to purchase a leasehold interest in a property in Arlington, Texas. To document this transaction, Borrower

[2]We will refer to Appellants by their respective roles in the transaction—Borrower and Guarantor—and to Pinnacle as the Bank.

and the Bank executed the following documents: (1) Loan Agreement; (2) Promissory Note; and (3) Leasehold Deed of Trust. Guarantor executed a Continuing Unlimited Guaranty (Guaranty).

Borrower defaulted on its obligations to the Bank. After notice of the default, the Bank accelerated the indebtedness. The Bank then sent notice that it would post for foreclosure the property that secured the loan and conduct a public sale of that property. The Bank conducted the foreclosure sale and made a winning bid of $30,000,000.

The Bank sued Borrower and Guarantor to collect a deficiency that it claimed had resulted from the difference between the indebtedness that Borrower owed and the Bank's bid amount. The Bank's petition alleged that Borrower had breached its Promissory Note and that Guarantor had breached her Guaranty. The Bank alleged a deficiency of approximately $7,000,000.

Borrower and Guarantor filed a joint answer. The answer alleged a host of affirmative defenses, which (among others) included the following:

> 5.  [The Bank's] claims against [Borrower and Guarantor] are barred, in whole or in part, because the foreclosure sale [that] it conducted on the subject property was improper and resulted in a sale for less than the fair market value of the property.
>
> . . . .
>
> 7.  [Borrower and Guarantor] are not liable for all or part of [the Bank's] alleged damages pursuant to Texas Property Code Section 51.003.

3

The Bank filed a motion for summary judgment on its claims for breach of the Promissory Note and Guaranty. The summary-judgment motion noted that "[Borrower and Guarantor]'s sole defense to this claim is that, under Section 51.003 of the Texas Property Code, they are entitled to offset the amount of the deficiency by the difference between the fair market value of the Property and the foreclosure sale price." The motion then outlined why Borrower and Guarantor had waived that defense. The motion sought judgment awarding the Bank its claimed $7,000,000 deficiency.

Borrower and Guarantor filed a motion to continue the hearing on the Bank's motion for summary judgment. The Bank responded to the motion for continuance, and Borrower and Guarantor replied. The grounds for the continuance were that Borrower and Guarantor had finally obtained discovery from the Bank that disclosed it held two appraisals of the property, one of which valued the property at $30,000,000 and the other of which valued it at $63,000,000. The grounds for the continuance were that the disclosure of two appraisals with such disparate values prompted a need for additional discovery.

Borrower and Guarantor also responded to the Bank's summary-judgment motion asserting that it was inequitable and unjust to permit the Bank to recover judgment for its claimed deficiency when the first appraisal valued the property at twice the amount of the Bank's foreclosure bid and when it appeared that the second appraisal was an after-the-fact effort to justify the bid amount. Borrower and

4

Guarantor again argued that the situation produced a need for additional discovery that warranted a continuance. The Bank responded to the continuance request by arguing that the discovery sought was "immaterial" because the trial court would decide as part of the summary-judgment process whether Borrower and Guarantor had waived the defense to which the proposed discovery was directed. The trial court denied the continuance.

After the continuance was denied, Guarantor filed a "Supplemental Brief in Further Opposition to Pinnacle Bank's Motion for Summary Judgment." The supplemental brief argued that the terms of the loan documents were ambiguous and did "not 'clearly and specifically' waive [Guarantor's] rights under Texas's deficiency statute [i.e., Section 51.003 of the Property Code]."

The trial court subsequently signed an order decreeing that the "Bank's Motion for Summary Judgment establishes that [Borrower and Guarantor] waived their rights for offset regarding fair market value under Section 51.003 of the Texas Property Code" and awarded the Bank a deficiency against Borrower and Guarantor, jointly and severally, in the amount of $7,606,841.70. The trial court later signed a final judgment that awarded the Bank its attorney's fees through judgment and on appeal.

Borrower and Guarantor filed a motion for new trial that was overruled by operation of law. They also filed a joint notice of appeal. Borrower later filed a notice to withdraw its notice of appeal.

## III. Analysis

### A. We conclude that Guarantor has waived the defense created by Property Code Section 51.003.

Guarantor argues that we should construe paragraph F2 of the Guaranty to waive only the defense under Section 51.003 that she derived from Borrower but not her own independent rights. The argument is an unreasonable construction of the Guaranty's language. Further, if the argument initially had any traction, it slips because the Guaranty broadly waived all defenses held by Guarantor, and those waivers are also sufficient to waive the Section 51.003 defense. Finally, Guarantor's assertion that the principle of strict construction requires us to bend the language of the Guaranty in her favor also fails in view of our conclusion that the Guaranty's language is unambiguous.

### B. We set forth the standard of review.

In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden of establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

Here, Guarantor does not contend that the Bank failed to establish as a matter of law its prima facie case of her liability on the Guaranty. Instead, she contends that

6

an issue arose with respect to an affirmative defense that made it error for the trial court to grant summary judgment. Usually, "[i]f the party opposing a summary judgment relies on an affirmative defense, [it] must come forward with summary[-]judgment evidence sufficient to raise an issue of fact on each element of the defense to avoid summary judgment." *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Woodside v. Woodside*, 154 S.W.3d 688, 691–92 (Tex. App.—El Paso 2004, no pet.); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 124 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see "Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936–37 (Tex. 1972). Here, the issue is whether that affirmative defense was waived by the provisions of the loan documents. The interpretation of an unambiguous instrument is a question of law, which we also analyze under a de novo standard of review. *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986); *Range Res. Corp. v. Bradshaw*, 266 S.W.3d 490, 492 (Tex. App.—Fort Worth 2008, pets. denied) (op. on reh'g).

### C. We explain the deficiency and Section 51.003.

The deficiency that the Bank sought to collect was for "the amount remaining on a debt after applying the proceeds realized at a foreclosure sale." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 4 (Tex. 2014). Here, the proceeds were the Bank's bid of $30,000,000, which Guarantor contends was far below a fair-market-value bid. Historically, the Texas Supreme Court has not permitted the courts to look behind the deficiency claimed after foreclosure because it has

7

"concluded that mere inadequacy of consideration does not invalidate a foreclosure sale and open the door to a fair[-]market[-]value determination." *Id.* This view created a pro-lender dynamic because it produced "little incentive for [a lender] to bid high [at a foreclosure] when a low bid preserves the amount they might get in a judgment against the borrower." *Id.* at 5.

To rebalance the playing field, in 1991, the Texas Legislature passed Section 51.003 of the Property Code, which gave a debtor the ability to challenge how a deficiency was calculated. *Id.* at 4–5. As an overview, Section 51.003 operates as follows:

> Under [Section 51.003], a deficiency judgment is still the amount by which the debt and foreclosure costs exceed the foreclosure sale price. But, that amount may be reduced if the borrower or guarantor files a motion under [S]ection 51.003. Section 51.003 provides that if the fact[]finder determines that the fair market value is greater than the foreclosure sale price, the party obligated on the debt may ask the court to offset the deficiency owed by the difference between the fair market value and the foreclosure sale price[.]

*Id.* at 5.[3] *Moayedi* characterized the protection offered by Section 51.003 as a defense. *Id.* at 6.

---

[3]The verbatim text of Section 51.003 is as follows:

(a) If the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section.

**D.    A party may waive the defense of Section 51.003.**

The supreme court in *Moayedi* held that a party may waive the defense of Section 51.003. *Id.* at 8. The court started from a premise that a party may waive statutory and even constitutional rights, and the supreme court could find nothing in

---

(b) Any person against whom such a recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale. The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value. Competent evidence of value may include, but is not limited to, the following:    (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

(c) If the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price. If no party requests the determination of fair market value or if such a request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency.

(d) Any money received by a lender from a private mortgage guaranty insurer shall be credited to the account of the borrower prior to the lender bringing an action at law for any deficiency owed by the borrower. Notwithstanding the foregoing, the credit required by this subsection shall not apply to the exercise by a private mortgage guaranty insurer of its subrogation rights against a borrower or other person liable for any deficiency.

Tex. Prop. Code Ann. § 51.003.

Section 51.003 by which the Texas Legislature had prohibited a waiver of the defense that section created. *Id.* at 6. But whether there was a valid waiver turned on the existence of language that clearly and specifically waived the defense that would sustain a view that the party had the intent to relinquish a known right. *Id.* at 6–7.

The supreme court summarized as follows the interpretive tools to use when deciding whether a guaranty agreement evidences a clear and specific waiver of the Section 51.003 defense:

> Courts construe unambiguous guaranty agreements as any other contract. If the meaning of a guaranty agreement is uncertain, "its terms should be given a construction which is most favorable to the guarantor." The interpretation of an unambiguous contract, however, is a question of law for the court. "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." Courts must "examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement. Moreover, unless the agreement shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning.

*Id.* at 7 (footnotes omitted).

Applying these tools, the supreme court concluded that a guaranty waived the Section 51.003 defense even though the waiver provisions did not mention that statute by name. *Id.* at 8. A general waiver in a guaranty of "any, "each," and "every" defense swept wide enough to embrace the specific defense of Section 51.003 because

10

"[t]o waive all possible defenses seems to very clearly indicate what defenses are included: all of them." *Id.*; *see also Godoy v. Wells Fargo Bank, N.A.*, 575 S.W.3d 531, 538 (Tex. 2019) ("In *Moayedi*, we held that by agreeing to a general waiver of all defenses in a guaranty agreement, a party waived the right of offset provided by [S]ection 51.003(c) of the Property Code.").

### E. Guarantor specifically waived the defense found in Section 51.003.

Guarantor focuses exclusively on one paragraph of the Guaranty in arguing that she did not waive a defense under Section 51.003. Though convoluted, the provision unambiguously waives the defense.

The Guaranty contains a waiver provision that spans almost two single-spaced pages. Paragraph F2 within this provision waives defenses and spans a page. The focus of the dispute before us involves a sentence that could only be composed by a lawyer or William Faulkner that addresses among other things a waiver of defenses under anti-deficiency laws:

> Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by [the Bank], even though that election of remedies, such as a nonjudicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers[,] or remedies of Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying[,] or discharging Borrower's Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair[-]market[-]value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Indebtedness.

11

Guarantor argues that there is an ambiguity in the quoted language because though the subject of the sentence forming the paragraph is "Guarantor," phrases within the sentence reference rights of the Borrower. She then argues that the sweeping phrase at the end of the paragraph that again embraces "any rights Guarantor may have" is limited rather than expanded by the preceding verb—"including."

As set out in Guarantor's brief, the crux of the argument is as follows:

It is reasonable to construe paragraph F.2 as only waiving Guarantor's rights *vis-à-vis* Borrower and not as a waiver of Guarantor's own rights under § 51.003. The preamble to the pertinent parts of paragraph F.2 defines the scope of the waiver which is limited to Guarantor's rights and defenses "arising out of . . . any loss of rights Guarantor may suffer" based on Borrower's "rights, powers[,] or remedies."

Guarantor is not asserting rights under § 51.003 that are derived from *Borrower's* "rights, powers[,] or remedies." Guarantor has her own rights under the statute because Guarantor is a "person against whom" the deficiency judgment is sought under § 51.003(b) and has the right to an offset against the deficiency under § 51.003(c) as one of the "persons against whom recovery of the deficiency is sought." There is nothing in paragraph F.2 that clearly or specifically waives Guarantor's own rights under the statute.

Guarantor's argument then proceeds that

[t]he only language in paragraph F.2 dealing with Guarantor's own rights is language waiving "rights Guarantor may have to a fair[-]market[-]value hearing to determine the size of a deficiency following any foreclosure sale . . . ." This language is preceded by the word "including[,]" which means it is a subset of the language before it.

12

Relying on the principle that guaranties are strictly construed in favor of the guarantor, Guarantor's argument continues that the trial court's summary judgment was erroneous because it "should have granted [her] the opportunity to develop and present evidence concerning the fair market value of the [p]roperty to be offset against the deficiency claim."

We disagree that Guarantor's interpretation is reasonable. As a starting point, when we combine the opening phrase and the beginning words of subsection F2(B), there are three references to the entity that is waiving rights, and it is clearly Guarantor who is waiving her rights. Specifically, "*Guarantor* further waives all rights and defenses *Guarantor* may have arising out of: . . . (B) any loss of rights *Guarantor* may suffer . . . ." [Emphasis added.] It is beyond counterintuitive to argue that these words can be interpreted to trigger a waiver of anyone's rights other than Guarantor.

The actual crux of Guarantor's argument relies on the reference to "Borrower" in subsection F2(B). That argument is that a guarantor is waiving only rights that belong to the borrower and not the guarantor. Initially, that premise is again contrary to the subsection's specification of whose rights are affected because the subsection begins with the phrase that it is addressing—"any loss of rights *Guarantor* may suffer." [Emphasis added.]

The subsection then continues with the prepositional phrase "by reason of" and introduces the mechanism that will produce the loss of rights that guarantor is waiving. That mechanism is "any rights, powers[,] or remedies of Borrower in

connection with any anti-deficiency laws or any other laws limiting, qualifying[,] or discharging Borrower's Indebtedness, whether by operation of law or otherwise."

Guarantor argues that this phrase refers only to remedies belonging to the Borrower, but how is that reading reasonable? The premise of this argument is that the Bank has Guarantor waive the defense held by Borrower to challenge a deficiency but then leaves exactly the same defense available to Guarantor.[4] To avoid this conspicuous contradiction, the reasonable construction is to read the words referring to "rights, powers[,] or remedies" held by Borrower as a description of a type of remedy held by Borrower. The remedy categorized by the words is a generic description of the mechanism found in the Section 51.003 defense, i.e., the remedy found in "anti-deficiency laws or any other laws limiting, qualifying[,] or discharging Borrower's Indebtedness, whether by operation of law or otherwise."

Characterizing the description as a category of remedy is also reasonable because the language specifically addresses the impact that an anti-deficiency law will have on "Borrower's Indebtedness." The capitalized term "Indebtedness" defines the most fundamental obligation of the guaranty—that Guarantor "unconditionally

---

[4]Moreover, as noted in the Bank's brief,

[E]arlier in the Guaranty, [Guarantor] expressly waived "any . . . defense of Borrower[.]" Thus, even accepting [Gurantor's] suggestion that a [g]uarantor has *two* mechanisms to assert the same defense—derivatively and independently—[Guarantor's] narrow interpretation that her waiver of "any rights Guarantor may have" is limited to *Borrower's* right is unreasonable. [Guarantor] already waived those defenses. [Record reference omitted.]

14

guarantees and promises to pay to [the Bank], or order, on demand in lawful money of the United States of America and in immediately available funds, any and all *Indebtedness* of Borrower to [the Bank]." [Emphasis added.] As with most provisions of the Guaranty, the term "Indebtedness" has a sweeping pro-Bank definition.[5] To impose Guarantor's interpretation twists this foundational obligation of the Guaranty into knots. That interpretation requires a reading that Guarantor has agreed to pay Borrower's Indebtedness, which cannot be reduced by the operation of an anti-deficiency statute. But to accept Guarantor's argument, we must then accept that Guarantor no longer has to pay the full amount of Borrower's Indebtedness because we should read paragraph F2 to mean that Guarantor's true obligation is only to pay the Indebtedness less whatever determination is made to reduce that indebtedness by operation of an anti-deficiency statute.

And if logic did not foreclose Guarantor's interpretation, the last phrase of the provision does. The ambit of the Guaranty's waiver of rights under an anti-deficiency

---

[5]The Guaranty provides,

The term **"Indebtedness"** is used herein in its most comprehensive sense and includes any and all advances, debts, obligations[,] and liabilities of Borrower, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management[,] or other similar transaction or arrangement, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. This Guaranty is a guaranty of payment and not collection.

statute is described as "including any rights Guarantor may have to a fair[-]market[-]value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Indebtedness." This phrase is a precise waiver of the very right that Guarantor claims that she is not waiving. If we understand Guarantor's argument, to achieve the sleight of hand that she advocates, we must ignore the phrase's plain meaning because the word "including" means that what follows is "a subset of the language before it." So, according to Guarantor, we should read a phrase that explicitly waives *her* right to be limited by a prior phrase and thus read the phrase to mean that it is not actually a waiver of Guarantor's rights but is instead a waiver of some mysterious right that is held by Guarantor but is derived only through the rights of Borrower and not held by Guarantor herself. This dizzying interpretation, rather than giving us pause, reinforces our view that the phrase preceding the explicit waiver by Guarantor is a description of a category of remedy. In other words, Guarantor is waiving rights under a category of remedy such as that found in Section 51.003, "including" one right that is a part of that remedy, which is Guarantor's right to have a "fair[-]market[-]value hearing to determine the size of a deficiency following any foreclosure sale."

Finally, it is suspect that the word "including" has the grammatically limiting effect in the context of the provision that Guarantor claims. As Antonin Scalia and

16

Brian Gardner have noted in their treatise, the word "include" expands rather than contracts:

> In normal English usage, if a group "consists of" or "comprises" 300 lawyers, it contains precisely that number. If it "includes" 300 lawyers, there may be thousands of other members from all walks of life as well. That is, the word *include* does not ordinarily introduce an exhaustive list, while *comprise*—with an exception that we will discuss shortly—ordinarily does. That is the rule both in good English usage and in textualist decision-making.

Antonin Scalia & Brian A. Gardner, Reading Law 132 (1st ed. 2012). And as both the treatise and the Bank note, Texas has codified an expansive definition of the words "includes" and "including" that makes them "terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." Tex. Gov't Code Ann. § 311.005(13). Giving the verb "including" an enlarging effect is in harmony with the obvious intent of subsection F2(B).

Our task in interpreting language is not to prod it until it yields an ambiguity. Instead,

> [t]he teaching of [] authorities [guiding our interpretive task] is that in interpreting a contract, we ascertain and give effect to the parties' intent expressed in the text, read without rendering any portion meaningless, and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address. A limited examination may yield reasonable, conflicting interpretations, but only when one interpretation does not clearly emerge as correct after a full examination is a contract ambiguous and the determination of its meaning left to a jury.

*Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 445 (Tex. 2024). The only viable interpretation of paragraph F2 is that Guarantor waived her rights to the defense found in Section 51.003.

We anticipate that Guarantor will challenge our holding by arguing that we have not given her a required measure of grace by strictly construing paragraph F2's language. Not so. Sixty years ago, the Dallas Court of Appeals held that the rule of strict construction does not require us to fabricate a nonsensical ambiguity:

> The rule of strictissimi juris is to be applied in dealing with guaranty contracts. Thus[,] a guarantor's obligation is limited to his undertaking and is not to be extended by construction beyond the terms thereof. There is no implied liability on the part of the guarantor and to charge the guarantor beyond the terms of his agreement, or permitting it to be altered without his consent, would not enforce the contract made by him, but would, in effect, make another for him.

> The cardinal rule to be observed in the construction of guaranty contracts, like those of other contracts, is to ascertain and give effect, whenever possible, to the real intention of the parties. This intention is to be discovered primarily by reference to the words used in the contract. If the contract is clear in demonstrating the intention of the parties, the settled rule requires the court to give effect to that intention and the court is not permitted to look to the subject matter and the attending circumstances in order to give it a different construction. However, if the meaning of the language is not plain, the attending circumstances may be considered by the court.

> Where uncertainty exists as to the meaning of a contract, rendering it susceptible to two interpretations, the one favorable to the guarantor, the other unfavorable, the interpretation will be given which favors the guarantor.

*Sw. Sav. Ass'n v. Dunagan*, 392 S.W.2d 761, 766 (Tex. App.—Dallas 1965, writ ref'd n.r.e.) (citations omitted).[6] We have followed the cardinal rule of referencing the words of the Guaranty to ascertain the real intent of the parties.[7] Those words do not create the ambiguity that Guarantor argues we should see in the language.[8]

---

[6]The supreme court cited *Dunagan* in *Coker v. Coker*, 650 S.W.2d 391, 394 n.1 (Tex. 1983). In turn, the portion of *Coker* citing *Dunagan* was support for the supreme court's statement in *Moayedi* that "[i]f the meaning of a guaranty agreement is uncertain, 'its terms should be given a construction which is most favorable to the guarantor.'" 438 S.W.3d at 7 & n.25. Guarantor also cites *Coker*.

[7]The only case that Guarantor cites that she claims has any direct bearing on her argument is *Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 132 (Tex. App.—Houston [1st Dist.] 2013, no pet.). *Village Place* involved a question of whether language in a guaranty was a waiver of the Section 51.003 defense, but the provisions relied on by the lender in *Village Place* were a far cry from the specific and blanket waivers in the Guaranty before us. We conclude that *Village Place* is inapposite.

[8]In her reply brief, Guarantor argues that "parsing" Paragraph F2 algebraically produces a meaning based on the limiting effect of the word "including" as "Guarantor asserts (Y) does not expand (X). The scope of the waiver is limited to Guarantor's loss of rights 'by reason of rights, powers[,] or remedies of Borrower in connection with any anti-deficiency laws.'" Our response is more earthy: Guarantor is asking the tail to wag the dog.

The crux of Guarantor's argument is that depending on the circumstance, "including" can be a term of enlargement or limitation. Guarantor pivots off this principle to argue that it dictates the following conclusion: "[b]ecause there are multiple possible meanings of the term 'including,' it is ambiguous." Guarantor further states, "Although there is no need to resolve the ambiguity because an ambiguous waiver is not sufficient under *Moayedi*, a textual resolution would favor the Guarantor."

The argument assumes that because "including" can point in two different directions, we are left without any ability to decide what is the more reasonable construction. Untrue. We have many tools to answer the question of what

19

## F.     Guarantor generally waived the defense found in Section 51.003.

*Moayedi* also instructs us that we must not let a laser focus on one provision blind us to the import of the entire document—"[w]hen parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement."  438 S.W.3d at 7.  The Bank catalogs other provisions of the Guaranty that make the conclusion inescapable that Guarantor waived her defense under Section 51.003.  One of those provisions is the same type of broad-sweeping waiver that *Moayedi* concluded waived the Section 51.003 defense.  We agree with the Bank that these provisions effect a waiver.

Initially, the Bank notes the all-sweeping provision of the Guaranty's paragraph F3 that "[b]y signing this Guaranty, Guarantor waives . . . (ii) without limiting any of the waivers set forth herein, any other fact or event that, in the absence of this provision, would or might constitute or afford a legal or equitable discharge or release of or defense to Guarantor."  We interpret this provision as tantamount to the one in *Moayedi* that embraced "any," "each," and "every" defense.  *Id.* at 8.  The breadth of the provision in the Guaranty prompts the same conclusion on our part that the provision in *Moayedi* prompted on the supreme court's part—"[t]o waive all possible defenses seems to very clearly indicate what defenses are included:  all of them."  *Id.*

constitutes the more reasonable construction—in this case context is our best helper. *See IDEXX Labs.*, 691 S.W.3d at 443 ("[W]e have long allowed that words must be construed in the context in which they are used.").  As we detailed above, Guarantor's "algebraic" approach yields an interpretation that twists the language into a pretzel, and we reject it.

20

In her reply brief, Guarantor continues to bob and weave with her argument that this provision lacks the sweep necessary to avoid the rule of *Moayedi*. Having ignored this provision in her opening brief, she now argues a bald conclusion that "[t]his waiver only covers any 'fact' or 'event.' Statutes, like [S]ection 51.003, are not facts or events. They are operative law and are not waived by the quoted language." What she is trying to argue is that a provision that sweeps so broadly that it waives an "event that . . . would or might constitute [a] . . . defense to Guarantor" does not embrace the defense under Section 51.003. An "event" is simply "something that happens." *Event*, Merriam-Webster.com, https://www.merriam-webster.com/ dictionary/event (last visited Jan. 12, 2026). Guarantor's argument requires a construction of the sentence that bidding on property at less than its fair market value does not fall within the all-encompassing definition of an "event" that constitutes a defense. As in *Moayedi*, we ask: What did Guarantor think that she was signing when she signed the Guaranty with this provision and all the others that we have catalogued? 438 S.W.3d at 7. We are not persuaded by Guarantor's argument.

And the all-sweeping provision is just a capstone of other provisions in the Guaranty that are clear waivers of Guarantor's rights. The Guaranty also provides as follows:

- "Guarantor waives *any defense* to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of Borrower *or any other person*[.]" [Emphases added.] Guarantor falls within the category of any other person. *See* Tex. Prop. Code Ann. § 51.003(b) ("Any person against whom [a deficiency] is sought by motion may

21

request that the court in which the action is pending determine the fair market . . . .").  The scope of this language could not be any broader.  Both Guarantor's opening brief and reply brief ignore this provision other than an oblique reference in Guarantor's reply brief grouping this provision with others and dismissively claiming that "[n]one of these constitute a broad waiver of all of Guarantor's rights and defenses" or that "[t]hese are specific waivers dealing with specific issues which do not relate to [S]ection 51.003."  If this argument is actually intended to apply to the quoted provision, it ignores the breadth of its language and the holding of *Moayedi.*

- Guarantor waives any defense based on or arising from "the cessation or *limitation* from any cause whatsoever, other than payment in full, *of the Indebtedness of* Borrower or *any other person*[.]"  [Emphases added.]  Guarantor is trying to limit her payment of the Indebtedness by a limitation that the Bank's bid did not correspond to the value of the property securing the debt and encompasses Guarantor's rights.  *See RCC Heritage Glade, Ltd. v. Branch Banking & Tr. Co.*, No. 02-15-00313-CV, 2016 WL 7473932, at *5 (Tex. App.—Fort Worth Dec. 29, 2016, pet. denied) (mem. op.) ("But this argument ignores both their unconditional assumption of unlimited liability for RCC's debt and the plain language of the 2009 and 2010 reaffirmations, which waives any offsets, claims[,] or defenses '*of Guarantor* with respect to the Guaranty.'").[9]

- Guarantor waives any defense based on or arising from "any act or omission by [the Bank] which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise."  Obviously, Guarantor was invoking Section 51.003 to alter the broad definition of "Indebtedness" that we quoted above.

---

[9]If we understand Guarantor's reply brief, she dismisses the scope of these provisions by arguing that provisions such as these "are specific waivers dealing with specific issues which do not relate to [S]ection 51.003."  Looking to the whole of the Guaranty, we do not share Guarantor's view that the effect of this provision can be dismissed out of hand and has no impact in determining whether Guarantor waived her Section 51.003 defense.  Guarantor's argument is an effort to turn a blind eye to *Moayedi*'s holding that a waiver need not reference Section 51.003 by name.  438 S.W.3d at 7–8.

The cumulative and cascading force of the general waiver of any defense and the other waivers that augment it, clearly and specifically demonstrate that Guarantor intended to waive every available defense, which perforce include the defense under Section 51.003.[10]  Even if we were to credit Guarantor's interpretation of paragraph F2's provision dealing with anti-deficiency laws, these later provisions remove all doubt.

We overrule Guarantor's sole issue.

## IV.  Conclusion

Having overruled Guarantor's sole issue, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  January 15, 2026

---

[10]We will not address the Bank's argument that the Guaranty operates in tandem with terms of the Deed of Trust and also effects a waiver.  The terms of the Guaranty are sufficiently clear and specific to obviate a need to look outside its four corners.

23